737 So.2d 240 (1999)
STATE of Louisiana
v.
Hymel J. VARNADO.
No. 97-KA-2823.
Court of Appeal of Louisiana, Fourth Circuit.
May 19, 1999.
*242 Harry Connick, District Attorney, Richard R. Pickens, II, Assistant District Attorney, New Orleans, LA, Counsel for Plaintiff-appellee.
Laura Pavy, Louisiana Appellate Project, New Orleans, LA, Counsel for Defendant-appellant.
Court composed of Judge JOAN BERNARD ARMSTRONG, Judge JAMES F. McKAY III, Judge MICHAEL E. KIRBY.
KIRBY, Judge.

END OF FRONT MATTER
On October 8, 1995, the defendant, Hymel Varnado, was indicted on twelve counts of aggravated rape, twelve counts of aggravated kidnapping, twelve counts of armed robbery, eleven counts of aggravated crime against nature, and three counts of attempted armed robbery. He pleaded not guilty. This case proceeded on counts relating to three victim: C.V., M.C., and T.C.[1]
After trial, a jury convicted the defendant of three counts of aggravated rape, violations of La. R.S. 14:42; three counts of aggravated crime against nature, violations of La. R.S. 14:89.1; two counts of aggravated kidnapping, violations of La. *243 R.S. 14:44; one count of second degree kidnapping, a violation of La. R.S. 14:44.1; and two counts of armed robbery, violations of La. R.S. 14:64. The defendant received the following sentences: 1) life imprisonment without benefit of parole, probation, or suspension of sentence on each count of aggravated rape and each count of aggravated kidnapping; 2) fifteen years at hard labor without benefit of parole, probation or suspension of sentence on each count of aggravated crime against nature; 3) twenty years without benefit of parole, probation, or suspension of sentence on the second degree kidnapping count; and 4) fifty years at hard labor without benefit of parole, probation, or suspension of sentence on each count of armed robbery. The sentences as to counts 1, 2, and 3 arose out of a single incident and were to run concurrently to each other, but consecutively to the sentences relating to the other incidents. The sentences as to counts 24, 25, 26, and 27 arose out of a single incident and were to run concurrently to each other, but consecutively to the sentences relating to the other incidents. The sentences as to counts 44, 45, 46, and 47 arose out of a single incident and were to run concurrently to each other, but consecutively to the sentences relating to the other incidents. The defendant appealed.

STATEMENT OF THE FACTS
At trial C.V., who was eighteen years old, testified that on April 22, 1995, she was babysitting for her sister. When her sister returned home at approximately 12:30 a.m., C.V. started her three-block walk to her house. She described the route she took. A man driving a car on Egania Street was apparently following her as she walked. The man backed up the car, got out, and told C.V. to enter the car. He said: "That's what you get for not wanting to f___ with me." The man had a black gun in his hand about twelve to eighteen inches from C.V.'s side. C.V. stated that she got into the car. The man had the gun in his hand as he drove away. He drove to an abandoned parking lot next to an abandoned warehouse and turned off the engine. The man told her to take off all of her clothes, and she complied. He then told her to jump over to the back seat and to "lay down." The man made her perform oral sex on him. The gun was in his hand at the time. Afterward he raped her vaginally and then told her to put on her clothes. He drove her back and dropped her off. C.V. said that she made eye contact when he approached her on the street and again when he was on top of her.
C.V. stated that she went home and got into the bathtub. After she told her mother what had happened, the mother took C.V. to Charity Hospital. She talked to police officers and gave them a description including two gold side teeth. She told the officers that she could recognize her attacker. An officer brought a photo lineup to her house on August 21, 1995. She picked out the defendant and initialed the photograph. C.V. said that she was "[m]ore than positive." She declared that she did not know either of the other victims. C.V. said that she did not know the defendant; however, three months before that night he had approached her on foot, used the name "Mel", and given her his phone number as she waited for her friend outside of a store. She took the information so that the defendant would leave. She eventually threw the piece of paper away. C.V. said that she did not realize that she had seen the man before until two or three weeks after the incident. On cross-examination, C.V. said that the man who assaulted her said that his name was "Mike". She testified that she did not see any tattoos or scars during the assault. She did not remember his clothes. She did not remember exactly when she told the officers that the man who assaulted her had given his name and phone number.
Detective Joseph Goins of the NOPD Rape Unit testified that he was handling a separate incident and needed to do some follow-up on August 21, 1995. Detective *244 Gai also needed to go to the Ninth Ward to show a photo lineup. The two went together. He was with Detective Gai when he showed C.V. the photos. They were outside, and Goins suggested that the lineup be done inside. He could not remember whether Gai and C.V. went inside or whether he was with them during the lineup.
M.C., who was twenty-seven years old in the summer of 1995, testified that on July 23, 1995 she worked her three o'clock to midnight shift at Bally's Casino. She left the parking lot at about 12:17 a.m. on July 24, 1995 and drove home to an apartment complex on Crowder Boulevard. She parked her car in the complex parking lot on Redwood Lane. As she exited her car, a maroon or burgundy Buick Century backed up and pulled in front of her. M.C. thought that the driver wanted to ask directions. When she looked at him, the man told her to give him her purse. He was pointing a gun at her. She complied. The lighting around the complex was fine. The man then told her to get into the car. He then instructed her to remove the money from her purse, and she complied. He backed out of the complex and asked her several questions including whether she lived alone. M.C. told him that she lived with her boyfriend. He asked her whether she had an ATM card and where she banked; she said she had a card and banked at the First NBC at Lake Forest and Read Boulevards. He told her that she would not be hurt if she cooperated. He drove to the bank and went up the wrong way so that M.C. could use the ATM machine from the passenger side. He told her to take out as much money as she could. She withdrew $400.00 and gave it to him. He made her try again, but she could withdraw no more. The man then drove to the parking lot of a photography studio. He turned off the engine and told her to undress. He then told her perform oral sex on him. She asked him for a condom, but then complied. The man then exited the car and made M.C. get on her knees and repeat the act. He then told her to walk to the back of the car and to place her hands on the car. She complied, and he penetrated her from behind. He then threw her uniform jacket on the ground and told her to lie down on it. The man then got on top of her and penetrated her again. He then made her get on her hands and knees and penetrated her from behind. At that point he turned her over and put his penis in her mouth again. He then threw her clothes to her and instructed her to get dressed. She complied. He then drove her back to the complex and dropped her off.
M.C. stated that she ran to her mother's apartment, but she was not home. A neighbor contacted her mother, who arrived home shortly. The mother called the police. She gave a description and told the officer that she would be able to recognize him. She saw him well when he first backed up the car in the apartment complex parking lot. A couple of weeks later M.C. attended a physical lineup; on August 10, 1995 she picked out the defendant and signed his photo. On cross-examination M.C. testified that her brother and her boyfriend went out that night and found a similar car with a warm hood. She answered affirmatively when she was asked whether the police fingerprinted her in order to identify and match them with the fingerprints taken from the car that was found.
T.C., a twenty year-old SUNO student, testified that on July 30, 1995 she was at her boyfriend's house all day. At about 10:30 p.m. she drove home to her grandmother's house. She noticed a gray car that appeared to be following her. When her car was in the middle of an overpass, the gray car sped up and cut in front of her. By the base of the overpass, the car had blocked her way. The man exited his car and was standing at the door of T.C.'s vehicle with a gun in his hand. He opened the door, and T.C. got a good look at him in the light. She made eye contact and asked him what he was doing. The man *245 told her to push over and he got into the driver's seat of the car. He asked her for money. She gave him the ten dollars from her pocket. He asked several questions. She answered that the car belonged to her, but was purchased by her mother. She said she that lived with her grandmother in the Desire Project and had no money in a bank. As the man drove, he told her several times not to look at him. He parked the car on the SUNO golf course right off Press Drive. He told her to turn off the car's headlights. Then he pulled down his pants and told her to perform oral sex. He had the gun in her face and she complied. The man told her to take off her clothes and she complied. She reclined her seat pursuant to his instructions; he raped her. He then ordered her to lie face down on the ground. She complied and he raped her again. He then told her to dress and she did. As they got back into the car, T.C. saw him clearly as he climbed over the seat to the driver's side. She looked straight at him and he told her to turn her head. She put on the headlights and he drove off the golf course. The man told her: "Bitch, you know I know you. I've been wanting to do this to you." She looked at him and thought that she knew him. She became nervous, and he tried to cover his face with his shirt. He dropped her off at the intersection of Alvar and Pleasure Streets where her grandmother lived.
T.C. stated that she exited the car and went straight to the police sub-station in the project. She told the officers that she had been raped and the perpetrator took her car. She gave a description including a tattoo on his right shoulder (KYMEL or HYMEL). She saw the tattoo when the dome light in the car stayed on for thirty seconds when they got back into the car and he was using the shirt to cover his face. She also told the officers that she thought she knew the perpetrator and his name was Hymel; she knew him from middle school. The rape unit officers took her to the hospital. On August 4, 1995 the officers conducted the photo lineup at a supermarket where T.C. was shopping at the time. She picked out the defendant and dated and signed the back of his photo. On August 10, 1995 she attended a physical lineup and picked out the defendant. She said that she was certain that the defendant was the perpetrator. The State then had the defendant show his tattoo to the jury.
Detective Gai testified that he took a description from C.V. in April 1995. It included gold teeth in the top of the mouth. She said that she could identify the perpetrator. Along with Detective Goins, he showed C.V. the photo lineup on August 21, 1995. They were outside on a street corner. She picked out the defendant. Detective Goins stood on the side because he was not handling the investigation of the crimes committed against C.V.
Detective Ned Gonzales of the NOPD Rape Unit testified that he monitors all rape cases. He contacted the victims and set up the physical lineup. He then went to the tiers in the Orleans Parish Prison to obtain fill-in participants who resemble the alleged perpetrator. Generally, the suspect and his attorney pick the location where each participant will stand. The victims are separated in the auditorium. At the end of the lineup each victim is brought individually into a room in the back of the auditorium, and in the presence of a prosecutor and the suspect's counsel they make their identifications. According to the forms, Detective Gonzales stated that M.C. and T.C. picked out the defendant.
It was then stipulated that Technician Edward Delery dusted the rear left driver's side exterior section and front right passenger's side exterior and interior sections of a red 1993 Buick Century, License DLR60497, for latent prints. Partial latent palm and fingerprints were submitted. Officer Gary Burmaster, an expert in latent fingerprints, would have testified that the prints taken from various locations could not be used for identification purposes. *246 It was also stipulated that Timothy Seuzeneau, a forensic light examiner employed by NOPD, would have testified that the latent prints taken from a number of guns and cartridges were negative.
It was stipulated that Pricilla Salsburg, NOPD criminalist, would have testified that she examined a pair of white, pink, and green flowered panties and found no blood. The panties were positive for spermatozoa and revealed Group AO secretor activity. Patricia Daniels, a medical technologist, would have testified that she examined samples from C.V. and found that the internal and external vagina swabs and oral swabs were negative for seminal fluid; the corresponding smears were negative for the presence of spermatozoa; the internal and external vaginal swabs and slides were bloody, and her group sample was Group O. Daniels would have testified that she examined samples from T.C. and found: the internal and external vaginal and oral swabs were negative for seminal fluid; the corresponding smears were negative for the presence of spermatozoa; her blood type is B. Daniels would also have testified that she analyzed specimens from M.C. and found: the internal and external vaginal swab was positive for seminal fluid; the internal swab tested positive for A and O blood group substances; the oral swab tested negative for seminal fluid; the internal vaginal smear tested positive for spermatozoa; the external vaginal and oral swabs tested negative for spermatozoa; the tube of blood tested as Group 0; the saliva sample tested positive for the Group O blood group.
Officer Joseph Tafaro, a forensic serologist, testified that he tested the defendant's blood; his blood is Group A. He was not able to find any blood group substances in the defendant's saliva sample, but seminal fluid has a larger amount of blood group substances to test. It was therefore not conclusive whether the defendant is or is not a secretor. He examined T.C.'s multi-colored panties and found that the panties were positive for seminal fluid and positive for Group A blood group substances. Because T.C.'s blood type was B, she would secrete B and O blood group substances; therefore, the Group A substances had to be produced by someone else. M.C. is Group O blood type; therefore, the A blood group substances found on her internal vagina swabs had to be produced by someone else. Because the defendant is Type A, he could not be excluded as a suspect. Because 20 to 30% of the black general population is Type A, then 70 to 80% of the population could not have contributed the Type A blood substances. There was no DNA testing done.
Detective Dennis Dejean of the NOPD Rape Unit testified that he initially interviewed T.C. on July 30, 1995 at the project sub-station. T.C. was upset, her clothing was disheveled, her hair was messed up, and she was frightened. She gave a description that included the tattoo (KYMEL or HYMEL). She indicated that she might have known the perpetrator years before in school. Another detective contacted the Orleans Parish School Board and a suspect was developed. T.C. picked out the defendant at the photo lineup on August 4, 1995. The defendant showed his tattoo in court; it read KEMEL. The detective said that it was partially the same, but there had been additions. Detective Dejean said that after T.C. picked out the defendant, he obtained a search warrant for his residence. The officers found a revolver, a semi-automatic pistol, an air pistol, a pellet pistol, and cartridges. The detective was questioned about the initial report, which indicated a tattoo of HAMEL, and a supplemental report, which includes that Hymel may have been a student with T.C. at middle school.
Dr. Richard Tabor, the ER doctor who examined T.C., testified that there was no trauma to the genitalia. He said that trauma was uncommon in sexually active women. He took the necessary samples for the rape kit. There were notations in the margin of his report indicating that no sperm were noted and the pregnancy *247 test was negative. Dr. Tabor referred to Dr. Linder's report of his examination of M.C. in the emergency room. There was no trauma to the genitalia. Dr. Tabor stated that there was no evidence of trauma in C.V.'s examination, but there was menstrual blood.

ERRORS PATENT
A review of the record reveals none.[2]

DISCUSSION

COUNSEL'S ASSIGNMENT OF ERROR NUMBER 1
The defendant contends that the sentences were excessive and constituted cruel and unusual punishment. He notes that this case involves only three incidents, but the defendant was sentenced collectively on all thirty-one of his convictions that involved three trials and a number of incidents. The defendant states that he received fourteen life sentences for the aggravated rape and aggravated kidnapping convictions, fifty year sentences for the seven armed robbery convictions, fifteen year sentences on the seven aggravated crime against nature convictions, fifty years for one attempted aggravated kidnapping conviction, thirty years for one first degree robbery conviction, and twenty years for one second degree kidnapping conviction. He notes that he objected and filed a motion to reconsider sentence, which was denied. He acknowledges that the sentences are legal and the life sentences are mandatory under the statutes. However, he argues that the sentences taken collectively are constitutionally excessive.
The only sentences at issue in this appeal are those imposed in the convictions relating to C.V., M.C., and T.C. He was sentenced to: life sentences without benefits on the three aggravated rape and two aggravated kidnapping convictions; fifteen years without benefits on the three aggravated crime against nature convictions; twenty years without benefits on the one second degree kidnapping conviction; and fifty years without benefits on the two armed robbery convictions.
The defendant argues that there were mitigating circumstances in his favor that make the sentences out of proportion to his conduct and the individual circumstances of each incident. The defendant had only one prior felony conviction for possession of stolen property valued over $500. None of the victims were beaten and no one was killed. The defendant did not fire a gun during any of the incidents.
Our state constitution prohibits the imposition of excessive punishment. La. Const. art. I, § 20. Although a sentence is within the statutory limits, the sentence may still violate a defendant's constitutional right against excessive punishment. State v. Sepulvado, 367 So.2d 762 (La.1979); State v. Francis, 96-2389 (La.App. 4 Cir. 4/15/98), 715 So.2d 457, writ denied, State ex rel. Francis v. State, 98-2360 (La.2/5/99), 737 So.2d 741. A sentence is unconstitutionally excessive if it makes no measurable contribution to acceptable goals of punishment, is nothing more than the purposeless and needless imposition of pain and suffering, and is grossly out of proportion to the severity of the crime. State v. Lobato, 603 So.2d 739 (La.1992); State v. Telsee, 425 So.2d 1251 (La.1983). However, a trial court has wide discretion in imposing a sentence, and its sentence will not be set aside as excessive absent a manifest abuse of discretion. State v. Scott, 593 So.2d 704 (La.App. 4 Cir.1991).
The defendant's prior felony was noted at the sentencing. The trial court stated that three juries convicted the defendant of the thirty-one felonies involving nine *248 separate and distinct incidents. The court noted that the State had dismissed cases involving three other women and twelve or thirteen additional counts. The court declared: "A significant reign of terror  a very, very significant reign of terror that was inflicted upon the nine women that were involved in this case that were victimized by you." The court noted that twelve women had been the defendant's victims. The trial court stated:
Absolutely unbelievable. Absolutely unbelievable. I know that the very degrading act, very degrading and despicable act, women which were taken  many of these women were kidnapped, raped in their own vehicles, or taken to deserted parts of town....
It's very difficult for anyone to have sympathy on you. I know the victims certainly feel that the sentence I'm going to impose is not going to be nearly enough to satisfy the pain and the terror that they went through. My heart goes out to them. I do feel sincerely sorry for them....
The defendant was convicted of thirty-one violent crimes, eleven of which were involved in this trial. As the defendant concedes, the life sentences were mandatory and the other sentences were to be served without benefits by law. The court correctly made the sentences for each incident run concurrently with each other, but consecutively to the sentences relating to the other separate incidents. The defendant does not point to any one individual sentence that was excessive. None of the sentences appear to be excessive or without support in the record. At sentencing, the trial court pointed out that the defendant had been on a reign of terror and was not a subject for sympathy. The court expressed sincere sorrow for the victims who had suffered such pain and terror.
The sentences imposed are not excessive. This assignment lacks merit.

PRO SE ASSIGNMENT OF ERROR NO. 1
The defendant argues that the trial court erred by denying his motion for mistrial when the prosecutor made a comment relating to his right to remain silent.
During the prosecutor's questioning of Detective Dennis Dejean, the following transpired:
Q Did you arrest Hymel Varnado?
A Yes.
Q And where did you arrest him?
A At 8533 Chase Street.
Q Did you advise him of his rights?
A Yes, I did.
Q Did he make any statements?
A No, he did not.
At that point defense counsel asked to approach the bench. At the end of trial outside the presence of the jury defense counsel noted that he had made a motion for mistrial when he approached the bench. He stated that he had declined the court's offer of an admonishment. Counsel argued that there was clearly a reference to the defendant's right to remain silent. The trial court denied the motion and stated that in the jury instruction it would explain that the defendant is not obligated to make a statement at any time. In the jury charge the trial court stated that the defendant was not required to testify at trial and that fact should not be considered or held against him. The court stated that the law did not require that the defendant make any statement, and his silence should not be held against him.
La.C.Cr.P. art. 770 provides in pertinent part:
Upon motion of a defendant, a mistrial shall be ordered when a remark or comment, made within the hearing of the jury by the judge, district attorney, or a court official, during the trial or in argument, refers directly or indirectly to:

*249 * * *
(2) Another crime committed or alleged to have been committed by the defendant as to which evidence is not admissible;
(3) The failure of the defendant to testify in his own defense.
The prosecutors questions were aimed at eliciting information about the defendant's arrest. The detective was asked whether the defendant was advised of his rights and whether he made a statement to the officer. This does not constitute a reference to the defendants failure to testify in his own behalf.
The defendant also claims that the prosecutors questioning constituted a comment on his post arrest silence. In State v. George, 95-0110, p. 8 (La.10/16/95), 661 So.2d 975, 979, the Louisiana Supreme Court discussed this issue:
This court has expressed its disapproval of placing before the jury evidence that the police advised the defendant of his Miranda rights at the time of his arrest when the testimony does not establish a predicate for admitting a subsequent oral or written inculpatory statement and thereby invites jurors to consider the defendant's post-arrest silence as an impeachment of an exculpatory account later offered at trial. State v. Mosley, 390 So.2d 1302 (La.1980); Doyle v. Ohio, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976). Nevertheless, not every reference to the defendant's post-arrest silence requires reversal. See State v. Bell, 446 So.2d 1191 (La.1984); State v. Middlebrook, 409 So.2d 588 (La.1981[1982]). In Mosley, the court found that prosecutor's single "oblique and obscure" reference to Miranda warnings during the testimony of the two arresting officers, without explicit mention of the defendant's postarrest silence, did not prejudice the defendant. State v. Mosley, 390 So.2d at 1305-1306.
In George, the detective was asked if he had read the defendant his rights, and defense counsel objected. When the trial court overruled the objection, the defendant stipulated that he had been advised of his rights. The prosecutor then asked the detective whether the defendant had made any statements after being read his rights. The detective answered negatively. Defense counsel objected and moved for a mistrial. The trial court denied the motion, but (at the request of defense counsel) the court admonished the jury that the fact that the defendant chose to remain silent should not be held against him in any manner. The Supreme Court did not find reversible error:
Although this case, unlike Mosley, involves an explicit mention of the defendant's post-arrest silence, Doyle condemns only "the use for impeachment purposes of [the defendant's] silence at the time of arrest, and after receiving Miranda warnings...." Doyle v. Ohio, 426 U.S. at 619, 96 S.Ct. at 2245, 49 L.Ed.2d 91 [emphasis supplied]; see State v. Arvie, 505 So.2d 44, 46 (La. 1987), wherein we stated "... the prosecutor may not use the fact of an accused's exercise of his constitutional right to remain silent, after he has been advised of this right, solely to ascribe a guilty meaning to the silence or to undermine by inference an exculpatory version related by the accused for the first time at trial." In this case, the trial judge's admonition made the prosecutor's remarks too obvious to miss, and invited the jurors to wonder why the defendant did not offer his alibi defense to the police at the time of his arrest. Nevertheless, in brief, counsel does not dispute the state's claim that it did not affirmatively exploit the testimony to impeach the defendant's exculpatory account offered at trial. In the absence of that affirmative misconduct by the state, reasonable jurors may have understood the testimony in the way that the first circuit took the remarks, as a description of how the police investigation culminated *250 in the formal arrest of the defendant with the routine incidents of custody, e.g., the reading of Miranda warnings to the person arrested.
State v. George, 95-0110 at p. 9-10, 661 So.2d at 980.
In State v. Kersey, 406 So.2d 555 (La.1981), there was questioning of the police officer as to whether at a certain point the defendant ceased talking. The officer answered affirmatively. The prosecutor then asked whether the defendant gave any further statements or whether he asserted his right to remain silent. As the officer began to say that the defendant had asserted his right, defense counsel objected. The trial court overruled the objection, but admonished the jury that no significance should be attached to a persons assertion of his right to remain silent. The Louisiana Supreme Court declared that La.C.Cr.P. art. 771 was the applicable provision. Where the prosecutor or a witness makes a reference to a defendant's post-arrest silence, the trial judge is required, upon the request of the defendant or the state, to promptly admonish the jury. In cases where the trial court is satisfied that an admonition is not sufficient, upon motion of the defendant, the trial judge may grant a mistrial. The Court noted that it did not appear that the reference was made for the purpose of simply calling the jury's attention to it or to have the jury make an inappropriate inference. It was a way of showing that the defendant's entire statement was before the jury and exploring how the interrogation concluded. Id. at 559-60.[3] See also State v. Stelly, 93-1090 (La.App. 1 Cir. 4/8/94), 635 So.2d 725, writ denied, 94-1211 (La.9/23/94), 642 So.2d 1309.
In this case, as in State v. George, supra, the prosecutor's questions were aimed at showing the circumstances of the defendant's arrest and the extent of the investigation; they were not designed to exploit the defendant's failure to claim his innocence after he was arrested in an effort to impeach or attack his defense. Defense counsel did not object or move for a mistrial until after the jury had heard the prosecutor's questions and the officer's answers. Counsel declined the trial court's offer to admonish the jury. Nevertheless, the court informed the jury in the instructions that the defendant was not required to make any statements, and his silence should not be held against him. There is no reversible error.
The trial court did not err by denying the motion for mistrial. This assignment lacks merit.

PRO SE ASSIGNMENTS OF ERROR NOS. 2, 3, AND 4
The defendant argues the prosecutor made improper comments during the States rebuttal closing argument, and a mistrial should have been granted.
La.C.Cr.P. art. 774 provides:
The argument shall be confined to evidence admitted, to the lack of evidence, to conclusions of fact that the state or defendant may draw therefrom, and to the law applicable to the case.
The argument shall not appeal to prejudice.
The state's rebuttal shall be confined to answering the argument of the defendant.
Even if such remarks go beyond the scope of art. 774, the remarks are harmless unless the reviewing court is thoroughly convinced that the remarks inflamed the jury and contributed to the verdict. State v. Byrne, 483 So.2d 564 (La.1986), cert. denied Byrne v. Louisiana, 479 U.S. 871, 107 S.Ct. 243, 93 L.Ed.2d 168 (1986); State v. Williams, 575 So.2d 452 (La.App. 4th Cir.1991), writ denied 578 So.2d 130 (1991).
*251 Arguments that go beyond the scope of Article 774, and do not fall within the ambit of La.C.Cr.P. art. 770, which requires a mandatory mistrial, are governed by Article 771. State v. Shannon, 531 So.2d 1113 (La.App. 4th Cir.1988), writ denied, 600 So.2d 632 (La.1992). Article 771 provides that upon request of the defendant "the court shall promptly admonish the jury to disregard a remark or comment made during the trial, or in argument within the hearing of the jury." Even if the remarks are improper, a reviewing court must be thoroughly convinced that the remarks influenced the jury and contributed to the verdict before a reviewing court may find reversal error. State v. Langley, 95-1489 (La.4/14/98), 711 So.2d 651; State v. Camp, 92-1842 (La. App. 4 Cir. 7/27/94), 641 So.2d 702, writ denied 94-2215 (La.2/17/95), 650 So.2d 250.
The defendant first points to the following prosecutors comments during rebuttal argument: And why there was so much objections to C.V. Defense counsel objected and declared that he had made proper objections to the State asking improper questions. Counsel said that he was not objecting to the witness explaining the route. The prosecutor withdrew the comment and said: I'm sorry. Defense counsel thanked the prosecutor, who said: Scratch that. During the prosecutors questioning of C.V. as to the actual route taken by the perpetrator, she became confused. The prosecutor continued, and the defense made a number of objections. The defendant argues that he was somehow prejudiced because the trial court did not admonish the jury to disregard the remark. The prosecutor withdrew the comment, which did not contribute to the jury verdict.
The defendant next focuses on the following:
MS. HOLOHAN:
And if it was a cops son, Mr. Whittaker said, about the DNA. He opened that door. NOPD is not gonna pay for DNA. It would have to be that police officer that would pay for it. We cannot
MR. WHITTAKER:
Your Honor, I object. I think that's improper and, in fact, incorrect.
MS. HOLOHAN:
That's an inference that he opened the door. He said if it was a police officers son
MR. WHITTAKER:
But its factually incorrect. The victim doesn't pay for the DNA. Its paid for by the State.
THE COURT:
All right, Ill sustain the objection to that comment. Ill sustain that, Mr. Whittaker.
MS. HOLOHAN:
Mr. Whittaker has the same access to all evidence, forensics included, blood and vaginal swabs, that the State does.
MR. WHITTAKER:
Your Honor, I object. That's incorrect. I have no burden. I have no crime lab. That's factually incorrect.
MS. HOLOHAN:
He has the same access to it.
THE COURT:
All right, there can be no inference that he has to do anything though and Ill explain that to the jury. He has no responsibility or no burden in this case.
In the jury instruction the trial court stated that the accused is presumed innocent until each element of the offense is proven beyond a reasonable doubt.
The defendant claims that the prosecutor attempted to shift the burden of proof to the defense. He argues that although the trial court sustained the defense objection, it did not promptly admonish the jury to disregard the comment; he was therefore prejudiced. The defense counsel objected to the prosecutor's comments (and the objection was sustained), but he did not request an admonition or *252 mistrial. When counsel fails to seek an admonition or mistrial, review of the alleged error is not preserved for appellate review. State v. Matthews, 95-1245 (La. App. 4 Cir. 8/21/96), 679 So.2d 977, writ denied, 96-2332 (La.1/31/97), 687 So.2d 403. Regardless, in light of the testimony of the three victims and their positive identification of the defendant, we are not convinced that the remarks influenced the jury and contributed to the verdict.
Lastly, the defendant argues that the prosecutor made a reference to other crimes in the closing rebuttal argument. The prosecutor stated:
It was last night that I kept reading the reports, reading the reports, and then it hit me. I had missed that point. Where T.C.'s car was found. And you notice in each crime, a different car was used? How did he get those cars? I don't know. I'll leave that up to you to discuss. But we know where T.C.'s car was, right by Hymel's house. Out of all of the places in the city to park, he parks right by his house. Another happenstance.
After that comment, the prosecutor concluded the rebuttal argument (according to the notation in the transcript). Then defense counsel approached the bench. The jury retired to deliberate and the defense counsel put the following on the record:
Judge, during the State's rebuttal argument, the prosecutor, Ms. Holahan, mentioned the fact that the perpetrator had used different automobiles in each instance and invited the jury to speculate on how it was that he came into possession of those different vehicles. It's my position, particularly given the facts of this case, that that is a reference to other crimes, either suggesting that he had, in fact, done the same thing to other victims or at the very least, had stolen automobiles as a matter of practice. And based upon that, I approached the bench and advised the Court that I was moving for a mistrial based upon the reference to other crimes evidence.
The trial court noted the objection and overruled it.
La.C.Cr.P. art. 770(2) provides that upon the motion of the defendant the trial court shall order a mistrial if the prosecutor refers directly or indirectly to another crime. Defense counsel did not approach the bench and move for a mistrial at the time that the comment was made. Counsel waited until the rebuttal argument had been concluded and the jury had been charged. Regardless, the taking of T.C.'s car or the other victims' vehicles would constitute part of the res gestae of the crimes. The prohibition against references to inadmissible evidence of other crimes under La.C.Cr.P. art. 770 does not include evidence which forms part of the res gestae. State v. Morris, 96-1008 (La. App. 1 Cir. 3/27/97), 691 So.2d 792, writ denied, 97-1077 (La.10/13/97), 703 So.2d 609.
These assignments have no merit. For the reasons stated above, we affirm the defendant's convictions and sentences.
AFFIRMED.
NOTES
[1] Due to the nature of these crimes, we will refer to the victims by their initials.
[2] The defendant discusses as an error patent the fact that the trial court did not advise the defendant of the three year prescriptive period for filing post conviction relief. The provision of La.C.Cr.P. art. 930.8(C) contains supplicatory language; it is a directive to the trial court and does not provide a remedy for an individual defendant. State ex rel. Glover v. State, 93-2330 (La.9/5/95), 660 So.2d 1189.
[3] The Supreme Court noted that defense counsel did not object timely; he objected after the prosecutor's question had been answered. Counsel did not request an admonition or move for a mistrial.